Good morning, number 18-30362, Mason v. Fall. I'd like to reserve five minutes for rebuttal. Jeffrey F. Speer on behalf of the appellant, Cormaine Mason, Brendan Mason, Billy Mason individually, and on behalf of that minor deceased son, major deceased son, Cormaine Mason. Your Honor, this case comes before you following a trial which occurred on March 5th, 2018. And having read the briefs, I don't expect I need to recite all of the facts that brought us here. Or I can go directly to the issues, whichever the court prefers. I think we're familiar with the facts. Thank you, Your Honor. We'll probably have some questions, but... Your Honor, we've brought this appeal primarily because it is our belief that the verdict was inconsistent. The verdict in question reflected that the jury answered two questions in response to the verdict that was posed before them. One of those questions was whether the defendant, Officer Martin Fall, acted in an excessively unreasonable manner in his use of lethal force and thereby violated the constitutional rights of Cormaine Mason. I think I heard you say excessively unreasonable, but did you mean to say objectively unreasonable? I meant to say excessively unreasonable force, objectively under the circumstances, Your Honor. And I'll find the exact verdict form here and read it to you. I was operating off of the top of my head. Forgive me. I'll find it. That's okay. We have it in our record excerpts.  Thank you, Your Honor. The second question... The reason I ask about that language is I assume what the jury verdict, that question doesn't cover, is subjectively unreasonable. As it pertained to Officer Martin Fall, of course it would be his subjective reason at the time. However, Your Honor, my reading of the case law turns on what a reasonable police officer would have perceived at the time, which would be an objective analysis versus the subjective analysis of this particular defendant. And that's the difference, as I've been reading the case law, between the subjective intent of this individual intended, the subjective perceptions that this individual defendant perceived at the time, whether he perceived a threat, versus whether a reasonable police officer under the same circumstances would have perceived such a threat. Back to the verdict form. The second question was very simple. Did the police officer, Martin Fall, is the police officer entitled to qualified immunity? And we believe that the first question to the verdict was, in fact, the standard for qualified immunity. And by answering yes to that question, the jury concluded on a factual basis, presented to them in the evidence, that this was a violation of Clemaine Mason's constitutional rights because of the excessively unreasonable use of lethal force by Officer Martin Fall. By answering that question, it is our contention that that was a denial of the qualified immunity defense afforded to police officers and governmental agents in particular for what may otherwise be negligent acts, and that the qualified immunity standard is not available to those whose actions shock the conscience of the court, that acted without regard and in disbelief that their actions were reasonable under the circumstances. Mr. Speer, what's your best case for saying that these inquiries were inconsistent? Your Honor, the best case that we believe reflects that this particular verdict was inconsistent is that this jury was utterly confused at the time that it deliberated as reflected by the questions which it posed to the trial judge, asking for clarification of the second question, asking to clarify the meaning of qualified immunity, which was followed up later after further deliberations by a question for what happens to the defendant, Officer Fall, if they find excessively unreasonable and qualified immunity. This jury, in response to question number one, well, I need to say they posed more questions. The first question, they said they were deadlocked. They came back. They were pressed to proceed and continue to deliberate. That's when they came back and asked for clarification of the meaning of qualified immunity, said back to deliberate again and instructed to read the instructions which the court gave on qualified immunity, with the next question out being the impact on Officer Fall if they found he acted excessively unreasonable but was entitled to qualified immunity. And I have the exact questions here that I could read. We're looking at, but what objections had you posed to the verdict or to the instructions? I mean, yeah, the jury instructions. I posed objections on multiple occasions, both pre-trial, during a charge conference, and during deliberations. The question number two rendered the verdict inconsistent and or redundant in that it was asking the same question and could lead to this very issue, which I bring before the court now, an inconsistent verdict. But basically, well, as to the instructions anyway, the judge was basically giving the Fifth Circuit pattern instructions, wasn't she? With the exception, Your Honor, that the instructions in this case referenced what Officer Martin Fall perceived as opposed to what a reasonable police officer perceived at the time of the event. Now, you're talking for immunity purposes or for excessive force purposes? I apologize, Your Honor. I didn't understand the question. Well, you said she posed, she did one of the instructions in terms of what he perceived. And which one was that? That was, and I have it, it was charge number 18, Your Honor. Okay. And the paragraph in particular stated that, if after considering the scope of discretion and responsibility generally given to law enforcement officers in performing their duties, and after considering all the circumstances of this case, as they would have reasonably appeared to Officer Fall at the time of the use of deadly force. And we objected to the use of that language as it was unnecessary, redundant, confusing, and did not focus on the objective standard that was required as opposed to the subjective standard that would have been applied had it just been Officer Martin Fall's perception. And the questions posed by the jury regarding qualified immunity were each met with a response by the court to go back and review charges dealing with qualified immunity, and we contend that those very charges were improper because they were subjective in nature versus the objective standard required to be used under the circumstances. And would you take that position even if this instruction is exactly like the Fifth Circuit pattern jury charge? Your Honor, if it was exactly like the Fifth Circuit charge, with all due respect, yes, I would object. However, I know that the Fifth Circuit didn't use Officer Martin Fall as a standard in its standard charge. And with the case law that I've reviewed reflects that a reasonable person or a reasonable police officer under the circumstances, an objective review should be the standard used. And for that reason, we objected to the charge at the time and during the deliberations. Because it became apparent, Your Honor, that this jury was very confused. And after having gotten to it, they asked the question about whether qualified immunity and the finding of excessive force, what impact would that have on Officer Fall individually? And it became rather obvious that this jury was confused over that standard, but in particular, as I argued at the time of trial, during deliberations, that word immunity, I believe, throws a juror who is not educated in the law and has certainly never seen a standard of qualified immunity into the position of wondering whether this is indeed a civil versus a criminal matter. And they did ask that question about the impact of qualified immunity if they found it was excessive force. Let me ask, did you put on any expert witness to testify about excessive force under these circumstances? Yes, Your Honor. We put on the testimony of expert Ron Scott, an expert in police procedure, ballistics, as well as the testimony of Dr. George Kirkham. Right. Dealing with police procedure and the circumstances surrounding the shooting. And of particular note therein is the fact that the court, citing Young versus Killeen, stated that anything leading up to the actual confrontation would not be allowed and therefore struck from introduction all of the opinions from the experts which led up to the exact confrontation. Whereas we believe that the actual standard under Young versus Killeen is not so broad as to discount and discard all of the actions that led up to the confrontation. There was expert testimony that indicated that these police officers rushed the scene, that after pulling up at the scene they were confronted by witnesses that had called 911. Witnesses who, by the way, matched the description of Khomein Mason. And they were told to get out of the way as Officer Paul retrieved his dog and told other police officers at the scene to follow him as he charged down the breezeway of this apartment complex, rounding the bend and literally running face to face with the defendant, Khomein Mason, and his girlfriend. Ex-girlfriend. Now, yes, Your Honor. At the time of that confrontation, the conduct of the police officers, the police officer in question, Defendant Paul, was such that this jury was clearly justified in answering the question, number one, about his conduct. Being a violation of the constitutional rights and the excessive or reasonable use of lethal force. Officer Paul testified himself, and we base this upon the admissions of the defendant as opposed to the statements of anybody else, including our experts. Officer Paul's testimony, which I should say at the outset, contradicted the statement he gave to the state police, was, at the time of trial, that he was an extremely experienced canine handler. That he flanked out to the left of the scene where Khomein Mason and his girlfriend were standing with their hands up. Whereas, in the state police statement, Officer Paul testified that Khomein Mason's hands were by his side and that the movement of his right hand up is what led him to use lethal force. Whereas, at trial, he testified that he had his hands up and that Officer Paul, who had his canine on a three-foot leash, and we know this because it was a 36-inch tether tied to this dog, he got close enough to Khomein Mason in the initial seconds that began this confrontation such that the dog was bouncing on his paws, snarling and barking and snapping at Khomein Mason, which Ms. Babineau said at least one of which struck Mr. Mason and caused him to flinch and or react. Okay. Well, your red light is on. So we can go into this more in detail on rebuttal. Thank you. All right, sir. Thank you. Ms. Rabelais. Good morning, Your Honors. May it please the Court, my name is Joy Rabelais and I represent Corporal Martin Fall. This is the second time this case comes to this honorable court, the second time we're here on qualified immunity. First time was on a summary judgment, and it was reversed with regards to the fact that the jury needed to evaluate and determine the credibility of Ms. Babineau's statements. Ms. Babineau, her statements in deposition were different than her statements to state police and were different than the eyewitness officers. I think what's very important in this case to remember is that the area in which this event occurred was very small. Photographs are an evidence. From the breezeway wall to the door of the apartment was about 16 feet. From the wall with the window to the area of the bushes, six or seven feet. And in that space, we had Ms. Babineau, Mr. Mason, three officers, and a canine. These things unfolded quickly. Officer Fall's statements, his testimony at trial, was not inconsistent with what he told state police. He was allowed at trial, obviously, under vigorous examination, cross, and redirect to further explain things. He never said that the hands went up and stayed up. He said that the hands were initially up. All three officers on scene saw the motion. Elbow up, handcuffed, where the weapon was in the waistband. Was that before or after the dog had gone after him? That was before, Your Honor. I thought it all happened at exactly the same time. And I'm not sure I understand why we need to talk about, from Officer Fall's perspective, any of the facts. Because you have a jury verdict that he used objectively unreasonable force by using a dog and a gun simultaneously against Mr. Mason. So isn't the real question, from your perspective, to talk about the qualified immunity, whether the jury verdicts are reconcilable, if they are, how they are, what case would we turn to as to how it could possibly be that you could use a dog and a gun at the same time on somebody and that that would nonetheless be entitled to qualified immunity? I think that's the real question. Okay, Your Honor. Thank you for the question. The first question is the question that was on the jury verdict form, but that doesn't end the inquiry. In fact, pattern jury instruction says, if you find that the plaintiff has proved by preponderance of the evidence that the force used was objectively unreasonable, then there's a Fourth Amendment violation. And is the second question in the pattern jury instructions? And then it says, and you must then consider whether defendant is entitled to qualified immunity, which is a board of liability. Your Honor, you asked what's the best case that states that these inquiries were inconsistent. I believe that they relied on Snyder, plaintiffs relied on Snyder. However, if you read Snyder more carefully, it cites to a case that I believe you authored in 1989. And that would be the Brown case, Your Honor. That does state that you can have, there is no inherent conflict between a finding of excessive force and a finding of qualified immunity. Well, because the Supreme Court said you can have reasonable but mistaken judgments. And if you look at Dr. Kirkham's testimony, which I think is maybe most useful here. Who's Dr. Kirkham? Dr. Kirkham. Kirkham, excuse me. Yes, Your Honor. You have the motion, let's take the dog out of the equation. You have the motion and a decision is made by the officer to use deadly force. All of the experts testify consistently that you don't have to wait for the suspect to touch the gun. You don't have to wait for the suspect to draw the gun. You don't have to wait for the suspect to point the gun. At that point, that perception justifies use of deadly force. Dr. Kirkham's problem was, despite that, you have a dog. Okay? So, if an officer, here's the question. If an officer can use deadly force because of his perception, then how is it that use of a less than lethal? If the decision is made to use deadly force, how is the release of the less than lethal force excessive at that point? This is all interesting in a summary judgment posture where you've got disputed facts, standards of review, as it was the first time this case came to the Fifth Circuit. But now, you've got a jury verdict that says it's objectively unreasonable. Correct, because that's how the pattern jury instructions read. And it says, then you make a determination. Right. And the jury did. But the legal questions are all that are before us now. That's, like, I understand why the appellant is describing the facts and circumstances of it, but I don't understand why Officer Fall would. Well, you know, Judge Ho posed a good question, but it doesn't answer whether he was subjectively, Officer Fall was subjectively unreasonable. And if we look at the history of qualified immunity, it was in common law defined as a good faith immunity. So you have to have some subjectiveness, I believe, at that point. So what we have here is a jury finding that the officer behaved in an objectively unreasonable manner. I take it your point is that it was nevertheless based on a factual misperception? Is that where you're going here? That or that any officer in his position, any officer, and the officers on scene, would have done the same thing. Well, I don't know about that. Well, the dog would have been released. Had he not released the dog and shot, the dog would have gone, because that's what the dog is trained to do. And there was testimony about that at the trial. What is your best evidence that, although your officer may have behaved objectively unreasonably, that your officer nevertheless had a misunderstanding about the facts? Well, there's a misunderstanding about whether you could release the dog. If you're in a deadly force situation, can you release the dog as well? Perhaps that is where the jury got hung up on question one. Unfortunately, we don't know why the jury got caught up on question one. Was the force objectively unreasonable? They came back deadlocked on the first question. Well, it looks pretty—I mean, I can see why they would have argued, because the guy gets shot seven times, two when he's already down on the floor, and the dog is at his body the entire time. And, Your Honor— That seems like a lot to me, especially when the officer is shooting from six feet, six feet distance approximately. The evidence that was presented at trial showed that all of this occurred within a couple of seconds. Exactly, which is why I don't understand why we're talking about his hand movements, because anyone who's attacked by an attack dog is going to move. I mean, that's—so I don't understand why it matters what— Well, there's been no specific finding. There was no question presented to the jury. Do you find that the hand movement came first or the dog came first? It happened at the same time, right? He saw it and decided to use the force. I thought that, Officer, from your perspective, I thought the best fact that you would have is that Officer Fall says it all happens at the same time. Hands, dog, gun, all at the same time, which obviously is physically impossible, but it's so quick that we're— That is it. He perceived the fighting stance. Officer Fall is coming to holster his weapon when he sees the movement, the gun, releases the dog, comes up and shoots. Did the other officers— It is as in—it can't be instantaneous, as Your Honor pointed out, but it is rapid succession. It is quick, and it is— But no other officer perceived a need to deploy deadly force. There's three of them there, and then the other two didn't seem to think that this was a problem. It was just Officer Fall. No, sir, Your Honor, they both testified that they, too, would have shot under that circumstance, but their line was blocked by Ms. Babineau. They both testified at trial that they would have fired, that it was a deadly force situation due to the movement, due to the fact that the hand was going to the gun. So their line of sight was blocked by Ms. Babineau to not use deadly force, but not as to see the hand movement? One officer saw the elbow come up, had not seen the gun quite yet, but heard Officer Fall yell, gun, gun. Officer Galan saw the gun, saw the hand movement. You have the tight space. You have officers flanked around. You have a woman who's upset moving around the scene, and that is why those things were observed by those officers, that they testified both to the state police and at trial. Now, how much of the evidence was excluded by the judge on the theory that some, you know, the seconds before this weren't relevant? The things that Dr. Kirkham wanted to testify to was similar to the things he wanted to testify to in the Young case, that they didn't take sufficient time when they encountered the complainant in the parking lot, that they didn't maintain cover and concealment, that they didn't maintain the 21-foot rule. All of these are far before pre-seizure, far before Officer Fall had to make that decision. Well, it couldn't have been that far before. There might have been 60 seconds before at the most, right, because he said. It was probably between one and four minutes. Why is that? I don't understand why that's not relevant. Because those things, that's what leads to jury confusion to say a canine should have never been on this call. Yeah, but the jury knew that these officers thought they were responding to an armed robbery. Correct. And then they go into the parking lot and they don't even speak to the person who made the call, right? That was contested at trial. Okay. Officers Galan and Dugas did speak to the complainant, Mr. Richardson. Well, you know, the jury might discount what Mr. Kirkham said or they might credit it. It's hard to say. And, of course, a violation of quote procedure is not tantamount to a constitutional violation. I still don't see why it was excluded. Well, I think what the judge said, Your Honor, was that when you looked at someone, an expert, if you will, being up there saying all these little things, you know, leading up to right at the moment, right at the decision to use the force, that could lead to jury confusion and to prejudice. Because, you know, one of the complaints was that one of the officers who was deceased prior to trial was there with a long rifle. Well, some people are very much against guns, so having a long rifle there, even though the long rifle wasn't used, could have inflamed the jury about the response. Did you do a motion in limine on that? Yes, ma'am, I did. Did she write an opinion on it? She rendered her rulings during the pretrial conference, which is part of the record. I did have it submitted as part of the record, Your Honor. Okay. And she did rule those sorts of issues. Now, Dr. Kirkham was allowed to testify with regards to the policy and training with the canine. Right. Okay? But not that had they called a hostage negotiator, things would have been different. And that's where his opinions were leading, that had the officers maintained cover and concealment, paid more heed to the 21-foot rule despite the fact they didn't have 21 feet there, had they done these things, had they not had the canine officer in the lead, had those things not been done, then this death wouldn't have happened. And that's not the question that's presented to the jury. The question is, did the officer perceive a threat at the moment that force was used? I don't know whether we'll be writing on this in our opinion or not, but I think that excluding that kind of testimony is seriously problematic. How many people were on the jury? Eight. Eight? Okay. And so the verdict was eight to zero? Is that what it must have been? It must be unanimous in the Western District. And at some point I noticed that Judge Doherty had accepted the recommendation denying summary judgment, but Judge Whitehurst, magistrate judge, tried the case? Correct, Your Honor. In the interim, Judge Doherty had retired. We had no warm bodies and no Article III judges in the Western District for over a year, so the parties at that point agreed to trial before magistrate. The case was over six years old when it went to trial. Oh, my gosh. Yes. It was Magistrate Whitehurst that ruled on the remand and used what Judge Higginbotham said his narrative was based on the summary judgment evidence, which I don't think is any longer relevant. But both Judge Higginbotham and Judge Whitehurst said that the issue of qualified immunity was something that had to go to the jury. I don't believe that Mason 1 precluded the issue of qualified immunity from going to the jury. And it went on the entire event, right, not on the first five shots or the last second shots? Correct. It was on the entire use of force. And is it also correct that the instruction on qualified immunity was verbatim, the Fifth Circuit pattern jury, or not? Correct. It was near verbatim. It relied on heavily. When we drafted it, that's in the record excerpts provided by the plaintiff's counsel. Right. I was looking at it. Yes. It is taken from both 10.1 and 10.3. I believe that what was changed was to show that it was an excessive force case and not a seizure case or an arrest case to insert the parties' names. There was nothing added to it. The objections, too, are in the record excerpts as well as the parties' arguments with regards to whether qualified immunity instruction should have been given and should have gone to the jury. I don't see that following pattern jury instructions can be clear legal error on the judge's part, nor do I believe that excluding Dr. Kirkham's, they should have stood 21 feet away, they should have called hostage people, they should have stayed away and tried calling inside the apartment, those woulda, coulda, shoulda arguments. I don't believe that that constituted an abuse of the court's vast discretion. The Second Amendment argument and the Graves exclusion of those two jury charges, I believe, were correct. Graves is an unpublished opinion and it is not part of the pattern jury instructions, nor part of any footnote in the pattern jury instructions. Plaintiffs failed to point out any specific evidence that they claim was omitted because of the judge's pretrial and during trial rulings using Young to state that it was at the moment the force was used, the relevant facts are the facts at the moment the force was used. Instead, you know, the plaintiffs rely on Judge Higginbotham's partial dissent in Mason 1, saying under that narrative on summary judgment, he didn't think Young applied. I don't see Young in saying that such evidence is irrelevant. I see it as saying that what has been the law consistently, that even if the officer is negligent, he can still be qualified, you can still have qualified immunity. Plus, Your Honor, violation of some policy. They don't say it's irrelevant and admissible. It may be negligence, but negligence does not equate to a constitutional violation. But that doesn't mean it's inadmissible. Well, the prejudicial effect of saying they did these few steps wrong, that had nothing to do with the ultimate decision to use the force. Well, it would depend ultimately on how many steps you did wrong. I guess at a certain point a jury might say, God, this fellow, you know, he was Sylvester Stallone or something, and he was inflicting his own version of justice. They could do that. They could, but that's not the evidence that we have in this case, Your Honor. All right. Thank you. Thank you, Your Honor. Thank you. Okay, Mr. Spear. Excuse me, Your Honor. I would like to address initially, because the court asked the question, the evidence which was excluded that would have certainly justified and supported this jury's answer to question number one was a video dash camera video of the girlfriend as she was being taken through the parking lot within seconds of the shooting by Officer Duga as she was taking Ms. Babineau to a patrol unit. And I profited that video, and that video reflected that Ms. Babineau was saying, Why did y'all shoot him? Why did y'all shoot him? And the police officer responded, because he had a gun, and Ms. Babineau responded, he did not have anything in his hand. That was a joint exhibit, which in the course of the trial, the judge came back after a recess, perhaps after a lunch, I forget which, and said that she had decided to exclude that video because it was prejudicial and not part of the confrontation and therefore in violation of Colleen. There were two other videos which were excluded, reenactment videos which were performed by Officers Galland and Duga who were present at the scene and part of the confrontation, and those videos, which we obviously didn't have them do, defense counsel had them perform the reenactments and they sent them to us. So delighted to have them, we sought to introduce them into evidence because they constituted a third version of events, of what transpired. And I proffered those videos into evidence as well. So when the court asked what evidence was excluded, those three videos go directly to the confrontation. Specifically and most importantly, Ms. Babineau, because the police indicated that she said in the course of her statement to them that he had taken his gun out to put it down. Curiously, that's the one statement that was not videoed. And it took place only after she had to be taken to the hospital for emotional breakdown, strewn with blood, and was eventually dropped back off at her apartment at 4.30 in the morning. She, at the time of her deposition, denied having any recollection of even saying it. And when deposed, she stated that at no time did Mr. Mason produce a gun. At no time did he conceal it. At no time did he threaten anyone. Insofar as the threat was concerned, it was perceived by Officer Falls that he testified to. It was simply the presence of the gun and the movement of the arm. The jury concluded that his actions were excessively unreasonable and a violation of the constitutional rights. However, even though they already answered that question, it should be noted that that simple movement of the hand was in reaction to the dog. And the facts of this case are that Cormaine Mason was over 6'2 with the shoes on and Officer Fall was 5'6. And by the defense doctor's pathologist's testimony, the first shot hit Cormaine Mason at better than 6'2 at a dramatically downward angle. And if you follow the testimony of Officer Fall, he said that he knew anyone that they released the dog on would drop their hand to protect themselves from the dog and that he himself would have dropped his hand to guard himself from the dog. So he obviously knew well in advance of releasing the dog that the hand would move. I presume he had – I suppose he's a right-hander and he has the dog's leash in his right hand. In other words, he doesn't have the leash in the opposite hand from his gun hand, right? It was my understanding, based on Officer Fall's testimony, and again, he had some contradictions in his testimony. And he indicated that my recollection from trial was that he had the gun in one hand, the leash in the other, but he also said that he would never again tie the leash to his hand because he couldn't create distance between himself and the suspect. This case, the movement of the hand precipitated Officer Fall by his own testimony. As the justice just indicated, Officer Fall threw the dog onto Mr. Mason and began shooting him simultaneously. And that's the difference between Snyder and Brown. There is no intervening fact that prevented this officer from having a reasonable, albeit mistaken, belief that there was some threat. All right, sir. We have your argument.  Thank you, Honest.